IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| MICHAEL MYERS, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:05CV00717 |
| | ) | |
| J.B. HUNT TRANSPORT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

TILLEY, District Judge

This matter is now before the Court on Defendant's Motion for Summary Judgment [Doc. # 14]. For the reasons set forth below, Defendant's Motion for Summary Judgment [Doc. #14] is GRANTED. The state law claims in the Complaint are DISMISSED because the Court declines to exercise supplemental jurisdiction.

I.

The facts in the light most favorable to the Plaintiff are as follows. In June 2004, Plaintiff Michael Myers received a conditional offer of employment from J.B. Hunt Transport, Inc. ("J.B. Hunt"). The offer was conditioned on Mr. Myers passing a road test and a Department of Transportation ("DOT") physical. For several years, Mr. Myers had been working as a truck driver and had previously passed a DOT physical. On June 14, 2004, Mr. Myers traveled from his home in

Surry County, North Carolina to the J.B. Hunt testing facility near Atlanta, Georgia.

While at the J.B. Hunt facility, Mr. Myers successfully completed the road test and received his DOT physical. Mr. Myers had his blood pressure taken and was instructed to sit on an examination table in an examination room. A physical therapist, whom Mr. Myers believed to be a physician assistant,[1] entered the room and began asking Mr. Myers questions regarding his left knee, which contained a visible scar. Due to bone disease, Mr. Myers had a prosthetic knee replacement resulting in a large scar on his knee. Mr. Myers believes that he was questioned about his knee based on the visibility of this scar. Mr. Myers performed certain flex tasks, and the degree of movement in his knee was measured. [Myers Dep. at 71]. Mr. Myers was then instructed to return to the waiting area.

Mr. Myers was then examined by Daniel Miller, a physician assistant employed by Concentra Health Services. Mr. Miller questioned Mr. Myers about the flexibility in his knee and whether he had any problems with his knee. [Myers Dep. at 72]. Mr. Miller asked Mr. Myers if he felt that he could perform the job for which he was being hired. [Myers Dep. at 72]. Mr. Miller then looked at Mr. Myers' eyes, ears, nose, throat, listed to his heart, and instructed him to return to the waiting room. [Myers Dep. at 73].

---

[1] Mr. Myers testified in his deposition that he was examined first by a physician assistant and then by a doctor. Mr. Myers' medical records indicate that he was examined first by a physical therapist and then by a physician assistant.

2

A few minutes later, Mr. Myers was instructed to take his file to the personnel office. The J.B. Hunt personnel representativetold Mr. Myers, "we're not going to be able to use you. You've got a knee problem." [Myers Dep. at 73]. The "Pre-Placement/ Post-Offer Results Form for Mr. Myers indicated: "Severe atrophy and weakness [in] left thigh and calf and ligaments instability secondary to three surgeries and prosthetic knee resulting in degenerative joint disease -- (Also would [have] difficulty with job essential functions due to lack of knee motion.)" [Myers Dep. Ex. 4; Myers Dep. at 81-82].

After being found medically ineligible for employment as a driver with J.B. Hunt, Mr. Myers believes that he was treated differently than the other employment candidates: he was "hustled about and handed papers and things in a rude manner." [Myers Dep. at 98]. Mr. Myers was paid $50 for the day and was given contact information to make flight arrangements to return to North Carolina. [Myers Dep. at 74].

Over the next seven to nine weeks, Mr. Myers was contacted at least once each week by J.B. Hunt recruiters who called to inquire why Mr. Myers had not completed the J.B. Hunt orientation. [Myers Dep. at 83]. To each caller, Mr. Myers explained that he had been told his knee prevented him from obtaining employment with J.B. Hunt. [Myers Dep. at 83]. Mr. Myers gave the callers his social security number, and each caller confirmed why he had not been hired. [Myers Dep. at 83-86]. On some occasions, the callers made comments such as

3

"we have to deal with people all the time that's not qualified to do the work." [Myers Dep. at 99]. Once Mr. Myers requested that he not receive any more calls from J.B. Hunt recruiters, the calls ceased. [Myers Dep. at 86].

On October 7, 2004, Mr. Myers filed a Charge of Discrimination against J.B. Hunt with the Equal Employment Opportunities Commission ("EEOC"). On or about May 20, 2005, Mr. Myers received a Dismissal and Right to Sue letter from the EEOC. Mr. Myers filed the instant action on August 16, 2005 alleging violations of Title I of the Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act of 1964,[2] the North Carolina Equal Employment Practices Act, and the North Carolina Handicapped Persons Protection Act. J.B. Hunt filed a Motion for Summary Judgment [Doc. # 14] on June 8, 2006.

---

[2]Title VII protects individuals from discrimination on the basis of gender, color, race, religion, and/or national origin. See Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 266 (4th Cir.2001) J.B. Hunt moved for Summary Judgment on Mr. Myers' Title VII claim on the grounds that Title VII does not authorize relief for disability discrimination and further asserted that Mr. Myers had not presented any facts charging discrimination based on race, color, religion, sex, or national origin. [Doc. #14, ex. 1 at 18]. Mr. Myers has not responded to J.B. Hunt's argument and appears to have conceded that he has not presented evidence of discrimination based on race, color, religion, sex, or national origin. Accordingly, Defendant's Motion for Summary Judgment is GRANTED as to Mr. Myers' Title VII claim and that claim is DISMISSED. See Fed. R. Civ. P. 56(e) (explaining that "summary judgment, if appropriate, shall be entered" if the party opposing summary judgment does not "set forth specific facts showing that there is a genuine issue for trial").

II.

Summary judgment is proper only when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001). An issue is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Cox, 249 F.3d at 299. There is no genuine issue of material fact if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. Celotex, 477 U.S. at 322-23. In essence, summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence, and the analysis concerns "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

III.

In order to establish a violation of the ADA, Mr. Myers must prove: (1) that he had a disability; (2) that he was qualified for the driver position; and (3) that J.B. Hunt rejected him due to discrimination solely on the basis of his disability. Doe v. University of Md. Med. Sys. Corp., 50 F.3d 1261, 1264-65 (4th Cir.1995); Tyndall v. Nat'l Educ. Ctrs., Inc., 31 F.3d 209, 212 (4th Cir.1991). A qualified

5

individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Before a court examines whether an individual can perform "the essential functions" of a position, it must first determine whether the applicant "satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." 29 C.F.R. app. § 1630.

While the ADA is designed to protect individuals from discrimination based on medical conditions, the ADA explicitly recognizes that employers may establish job qualification standards that ultimately have the effect of denying employment to disabled persons based on a disability. See 42 U.S.C. § 12113. In fact, such job qualification standards may be established by another federal law or regulation; the regulations implementing the ADA specifically provide:

> It may be a defense to a charge of discrimination under this part that a challenged action is required or necessitated by another Federal law or regulation, or that another Federal law or regulation prohibits an action (including the provision of a particular reasonable accommodation) that would otherwise be required by this part.

29 C.F.R. § 1630.15(e).

Congress has given the Secretary of Transportation the power to prescribe the qualifications for drivers of commercial motor carriers. 49 U.S.C. § 31102(b)(1). The DOT, through the Federal Motor Carrier Safety Administration, has promulgated the "Federal Motor Carrier Safety

6

Regulations," which establish the "minimum qualifications for persons who drive commercial motor vehicles as, for, or on behalf of motor carriers" and also establish the "minimum duties of motor carriers with respect to the qualifications of their drivers." 49 C.F.R. § 391.1. Under these regulations, the DOT requires that every individual seeking to drive commercial motor vehicles must pass a DOT physical examination. See 49 C.F.R. § 391.41(describing physical qualifications for drivers). Specifically, a "medical examiner is required to certify that the driver does not have any physical, mental, or organic condition that might affect the driver's ability to operate a commercial motor vehicle safely." 49 C.F.R. § 391.43(f).

In this case, the medical examiners who conducted Mr. Myers' DOT physical examination determined that he had "severe atrophy and weakness" in his left thigh and calf. Based on this examination, Mr. Myers was deemed "Not Capable Due to Medical Risk." Since Mr. Myers failed to obtain the required DOT certification, he was not qualified[3] for the position of motor

---

[3] Mr. Myers has also asserted a claim for harassment under the ADA. In order to make out a claim for harassment under the ADA, Mr. Myers must show that: (1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer. Fox v. Gen. Motors Corp., 247 F.3d 169, 177 (4th Cir. 2001). As noted, Mr. Myers did not receive the requisite medical certification and thus is not a "qualified individual." As such, Mr. Myers cannot satisfy the first element of his ADA harassment claim.

carrier driver. Mr. Myers may not claim that he was unlawfully denied employment for a position that he was deemed not qualified to perform pursuant to applicable federal regulations. See Campbell v. Fed. Express Corp., 918 F. Supp. 912, 919 (D. Md.1996) (applicant's failure to obtain DOT certification rendered him not qualified for driver position).

IV.

Mr. Myers claims that he was qualified for the J.B. Hunt position but that he was not allowed to demonstrate his ability to perform the requisite functions of the position. Mr. Myers claims that Mr. Miller (and/or the physical therapist) viewed the scar on his knee, made discriminatory assumptions regarding his ability to perform the essential functions of the position, determined, based on these discriminatory assumptions, that he would not be able to complete the agility tests, and thus concluded that he failed the DOT physical without completing a through examination. [Doc. # 19 at 12-13]. Mr. Myers asserts that he should have been allowed to perform the agility tests at the J.B. Hunt training facility and that his performance on those tests would have demonstrated his ability to perform the job duties associated with driving a truck.[4] Essentially, Mr. Myers

---

[4] Mr. Myers does not address why the flex measurement and step testing that were performed would not be a sufficient basis to sustain the finding that he could not pass the DOT physical examination.

8

challenges the manner in which Mr. Miller conducted the DOT physical examination.

Whether Mr. Miller's examination was properly conducted is not properly before this Court. Rather, the proper forum to decide that matter is the Office of Motor Carrier Research and Standards. The DOT regulations establishing the physical qualifications for drivers also establish appeal procedures for individuals who have not passed the DOT physical examination. See 49 C.F.R. § 391.47, § 391.49. In particular, the regulations allow an applicant and/or a potential employer to seek a waiver of the DOT physical in the event the applicant has failed to obtain the requisite certification. 49 C.F.R. § 391.49. Neither Mr. Myers, nor J.B. Hunt on his behalf, sought such a waiver.

In addition, the regulations provide a procedure by which an applicant may challenge the determination of the employer's medical provider by having the Director of the Office of Motor Carrier Research and Standards resolve a dispute between the employer's medical provider and a medical provider selected by the applicant. 49 C.F.R. § 391.47. Mr. Myers asserts that he is qualified for the job because he has worked as a truck driver for various trucking companies since 1994, and thus has previously obtained the requisite DOT certification. [Doc. # 19, at 11]. However, if Mr. Myers wanted to challenge Mr. Miller's determination that he failed the DOT

9

physical by submitting the determination of a different medical provider who concluded that he passed the DOT physical, the regulations require that he submit an application to the Director for such determination prior to seeking any judicial review.

Courts addressing claims similar to that of Mr. Myers have held that "[e]xhaustion of DOT procedures should be required" in circumstances involving driver certification because driver fitness "falls squarely within the regulatory scheme (and substantive expertise) of DOT." Campbell, 918 F.Supp. at 918; see also Harris v. P.A.M. Transp., Inc.,339 F.3d 635, 638 (8th Cir. 2003) (noting that "Congress has delegated to the Secretary of Transportation the authority to prescribe driver qualifications" and finding that driver's "refusal to seek relief under the DOT procedures require[d] dismissal of his ADA claim"); Prado v. Cont'l Air Transp. Co., 982 F. Supp. 1304, 1307 (N.D. Ill.1997) (refusing to hear plaintiff's argument "that he would have qualified for DOT certification but for [the medical examiner's] flawed physical examination procedures and medical conclusions" because the "proper forum to decide those matters was before the Office of Motor Carrier Research and Standards.").

It is a "long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Cavalier Tel., LLC. v.

10

Virginia Elec. and Power Co., 303 F.3d 316, 322 (4th Cir. 2002) (citation omitted). In this matter, Mr. Myers failed to pursue his administrative remedies regarding the propriety of Mr. Miller's medical examination. As such, Mr. Myers has failed to exhaust his administrative remedies, and his ADA claim must be dismissed.

V.

For the reasons stated above: Defendant's Motion for Summary Judgment as to the ADA claim [Doc. #14] is GRANTED. The state law claims in the Complaint are DISMISSED because the Court declines to exercise supplemental jurisdiction.

This the day of November 30, 2006

                                            /s/ N. Carlton Tilley, Jr.
                                            United States District Judge

11

Case 1:05-cv-00717-NCT-PTS   Document 25   Filed 11/30/06   Page 11 of 11